# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ONLINE HEALTHNOW, INC. and BERTELSMANN, INC., | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | **C.A. No. 2020-0654-JRS** |
| CIP OCL INVESTMENTS, LLC, CIP CAPITAL FUND, L.P., JUSTIN LIPTON, KEVIN FORMICA, PATRICK SHEAHAN, and TODD WILSON, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: April 15, 2021
Date Decided: August 12, 2021

Philip Trainer, Jr., Esquire and Marie M. Degnan, Esquire of Ashby & Geddes, Wilmington, Delaware and Andrew Zimmitti, Esquire and Joshua Drian, Esquire of Manatt, Phelps & Phillips, LLP, Washington, DC, Attorneys for Plaintiffs Online HealthNow, Inc. and Bertelsmann, Inc.

Rudolf Koch, Esquire, Travis S. Hunter, Esquire and Matthew D. Perri, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware; Jeffrey B. Korn, Esquire and Vanessa C. Richardson, Esquire of Willkie Farr & Gallagher LLP, New York, New York; and Alexander L. Cheney, Esquire of Willkie Farr & Gallagher LLP, San Francisco, California, Attorneys for Defendants CIP OCL Investments, LLC, CIP Capital Fund, L.P., Justin Lipton, Kevin Formica, Patrick Sheahan and Todd Wilson.

**SLIGHTS, Vice Chancellor**

In a scene from the classic film *Butch Cassidy and the Sundance Kid*, the scofflaw protagonists are frustrated in their attempts to gain entry into a cash-filled train car as they attempt to rob it.[1]  In his frustration, Butch resorts to a heavy dose of dynamite, apparently too heavy.  On detonation, the entire train car, and its contents, are blown to bits.  As the ash from incinerated currency rains down, Sundance turns to Butch and asks sarcastically, "Think you used enough dynamite there, Butch?"

The issue addressed in this opinion is whether, in the context of an acquisition agreement, Delaware courts should enforce broad contractual limitations on the right of contracting parties to bring post-closing claims that are so potent they effectively eviscerate all claims, including those that allege the contract itself is an instrument of fraud.  In other words, can parties to a contract, by their agreement, detonate all *bona fide* contractual fraud claims (discovered or undiscovered) with the stroke of their pens at the closing table.[2]

---

[1] BUTCH CASSIDY AND THE SUNDANCE KID (Campanile Productions, Newman-Forman Co. 1969).

[2] In this opinion, I use the term "contractual fraud" to describe a statement made in the contract itself that is known by the party or parties making it to be false and on which the other party to the contract relies to its detriment.  *See ChyronHego Corp. v. Wright*, 2018 WL 3642132, at *1 (Del. Ch. July 31, 2018) (contrasting "extra-contractual fraud"—claims based on knowingly false representations made outside of the contract—with "contractual fraud"—claims based on knowingly false representations made in the contract).

Plaintiffs, Online HealthNow, Inc. ("OHN") and Bertelsmann, Inc. ("Bertelsmann" or the "Buyer"), bring fraud and related claims against Defendants, CIP Capital Fund, L.P. ("CIP Capital"), its holding company CIP OCL Investments, LLC ("CIP OCL" or the "Seller") and its beneficial owners and agents, arising from representations and warranties within a Stock Purchase Agreement ("SPA") that allegedly were known to be false when made.[3] Defendants have moved to dismiss under Chancery Rule 12(b)(6) on the ground that the SPA itself makes clear that Plaintiffs agreed the claims they seek to prosecute were eradicated upon closing.

In general terms, a seller can contractually seek to modify its exposure to a post-closing fraud claim by bargaining for limits on: (1) "what" information the buyer is relying upon, (2) "when" the buyer may bring a claim, (3) "who" among the sellers may be held liable and "who" among the buyers may pursue a claim, and (4) "how much" the buyer may recover if it proves its claim.[4] In his seminal decision, *ABRY Partners V, L.P. v. F & W Acquisition LLC*,[5] then-Vice Chancellor Strine addressed the "What" limit, and held that parties to a contract may

---

[3] D.I. 16 (Pls.' Am. Verified Compl.) ("Compl.") Ex. 1 (Stock Purchase Agreement) ("SPA").

[4] *See* Fridrikh V. Shrayber & Morgan J. Hanson, *Anti-Reliance Clauses and Other Contractual Fraud Limitations Under Delaware Law*, 25 Widener L. Rev. 23, 26–27 (2019) [hereinafter Shrayber & Hansen, *Anti-Reliance Clauses*] (laying out the "what," "when," "who," and "how much" framework for contractual limits on contractual fraud).

[5] 891 A.2d 1032 (Del. Ch. 2006).

contractually disclaim reliance on extra-contractual statements whether true or false, but a seller may not contractually limit its liability for making knowingly false statements within the contract itself. [6] *ABRY Partners* also addressed the "How Much" limit, and held that contractual caps for indemnification claims will not cap the recovery for contractual fraud.[7]

The parties here agree that *ABRY Partners* addressed the "What" and "How Much" limits as just described. They disagree, however, on whether *ABRY Partners* delineates the extent to which parties may set "When" and "Who" limits on the right to prosecute a contractual fraud claim post-closing. While the SPA contains remarkably robust survival, anti-reliance and non-recourse provisions that appear to atomize Plaintiffs' claims across all of the recognized planes of contractual limitations, invoking *ABRY Partners* and its progeny, Plaintiffs maintain these provisions are unenforceable as a matter of Delaware law and public policy.

In Counts I–IV, Plaintiffs seek to hold all Defendants liable for their knowing participation in making false representations and warranties in the SPA with respect to OnCourse Learning Corporation's ("OCL") "sales and use tax liability" and its "valid accounts receivable" for the purpose of inducing Plaintiffs to execute

---

[6] *Id.* at 1062–63.

[7] *Id.* at 1064.

3

the SPA. Count V seeks a declaratory judgment that clarifies the procedure to be followed in the event the parties dispute post-closing working capital adjustments.

Defendants' motion to dismiss is straightforward, predicated on the bargained-for provisions in the SPA that expressly limit the parties against whom Plaintiffs may assert post-closing claims and the time in which such claims may be brought. As to Count V, Defendants maintain there is no actual controversy that would justify declaratory relief because the SPA makes clear that all post-closing disputes regarding working capital adjustments are to be submitted to a nationally recognized accounting firm with experience in such matters, as specified in the SPA.

For reasons explained below, Defendants' motion to dismiss must be denied. Under Delaware law, a party cannot invoke provisions of a contract it knew to be an instrument of fraud as a means to avoid a claim grounded in that very same contractual fraud. Stated more vividly, while contractual limitations on liability are effective when used in measured doses, the Court cannot sit idly by at the pleading stage while a party alleged to have lied in a contract uses that same contract to detonate the counter-party's contractual fraud claim. That's too much dynamite. As for the declaratory judgment count, because the working capital dispute is entangled with Plaintiffs' fraud claim, it cannot be said, as a matter of law, that Plaintiffs must submit their dispute to the accountant now before the fraud claim is adjudicated. Accordingly, the declaratory judgment claim also survives dismissal.

4

## I. BACKGROUND

The facts are drawn from the pleadings, documents incorporated into the pleadings by reference and matters of which the Court may take judicial notice.[8] In all cases where the Court decides a motion to dismiss under Chancery Rule 12(b)(6), but especially in cases involving allegations of fraud, it is important to emphasize that in the recitation of facts that follows, as it must, the Court has accepted all well-pled allegations in the Complaint as true.[9]

### A. Parties

Plaintiff, OHN, is a Florida corporation with its principal place of business in North Carolina.[10] Plaintiff, Bertelsmann, is a Delaware corporation with its principal place of business in New York, New York.[11]

Defendant, CIP OCL, the Seller as identified in the SPA, is a Delaware limited liability company.[12] Until November 1, 2018, CIP OCL owned all of the issued and outstanding shares of CIP OCL Holdings, Inc. ("OCL Holdings" or the "Company"), subsidiaries of which included CIP OCL Acquisition, Inc. ("OCL Acquisition")

---

[8] *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 612–13 (Del. 1996).

[9] *Id.* at 612.

[10] Compl. ¶ 14.

[11] Compl. ¶ 15.

[12] Compl. ¶ 16.

5

and OCL. OCL provides continuing education programs to millions of adult professionals, mainly in the United States.[13]

Defendant, CIP Capital, is a Delaware limited partnership with its principal place of business in New York, New York.[14] CIP Capital is a private equity fund that, at all relevant times, directly owned (in part) and controlled CIP OCL.[15]

Defendant, Justin Lipton, is CIP Capital's co-managing partner and a former director of CIP OCL.[16] He represented CIP Capital and was the face of the Seller during the negotiations of the SPA and eventual sale of OCL Holdings.[17] Lipton signed the SPA and all amendments thereto on behalf of the Seller as its "Authorized Person."[18]

---

[13] Compl. ¶ 24.

[14] Compl. ¶ 17.

[15] *Id.*

[16] Compl. ¶ 18.

[17] *Id.*

[18] *Id.*

Defendant, Kevin Formica, is a Vice President at CIP Capital.[19] He also represented CIP Capital and was instrumental in the Seller's efforts leading to the sale of OCL Holdings.[20]

Defendant, Patrick Sheahan, was the sole director of OCL until closing on November 1, 2018, and was the President and Chief Executive Officer of OCL until November 15, 2018.[21] Sheahan also had an equity interest in the Seller through a management equity program and thereby benefited directly from the sale of OCL Holdings to Bertelsmann.[22]

Defendant, Todd Wilson, was the Chief Financial Officer of OCL until November 15, 2018 (together with Lipton, Formica and Sheahan, the "Individual Defendants").[23] Wilson also had an equity interest in the Seller through a management equity program and, therefore, directly benefited from the sale of OCL to Bertelsmann.[24]

---

[19] Compl. ¶ 19.

[20] *Id.*

[21] Compl. ¶ 20.

[22] *Id.*

[23] Compl. ¶ 21.

[24] *Id.*

**B. CIP Capital Explores a Sale of OCL Holdings and Its Subsidiaries**

During the summer of 2018, CIP Capital initiated a process to sell OCL Holdings,[25] which owned OCL Acquisition and OCL Acquisition's wholly-owned subsidiary, OCL.[26] In this regard, CIP Capital retained a financial advising and consulting firm, Harris Williams & Company ("Harris Williams") to act as its advisor, agent and representative in connection with the planned sale.[27] Once engaged, Harris Williams and CIP Capital formed a "working group" to manage various aspects of the marketing and sale of OCL Holdings (the "CIP Working Group").[28] The CIP Working Group was comprised, in part, of representatives from Harris Williams, CIP Capital (Lipton and Formica) and OCL (Sheahan and Wilson).[29]

Suitors interested in acquiring OCL Holdings directed all communications to Harris Williams, who then relayed those communications to the CIP Working Group (and, in particular, to the Individual Defendants).[30] Questions regarding OCL's day-

---

[25] Compl. ¶ 33.

[26] Compl. ¶ 26.

[27] Compl. ¶ 33.

[28] Compl. ¶ 34.

[29] *Id.*

[30] Compl. ¶ 35.

to-day operations or procedures were directed principally to either Sheahan or Wilson (or another officer or employee of OCL) who would then respond directly to the inquiry.[31]

Lipton and Formica instructed the CIP Working Group regarding what information should populate the separate due diligence data rooms for potential bidders, including what information to include regarding OCL's tax obligations and liabilities.[32] On July 29, 2018, Formica directed Wilson to provide potential bidders with skewed financial results and projections for 2018 in order to support OCL's inflated EBITDA forecast.[33]

## C. OCL's Accumulation of Tax and Related Liabilities

Between 2014 and 2018, OCL sold many of its educational service products through its website using an eCommerce software platform called Magento.[34] OCL assigned, or should have assigned, each product listed for sale in Magento a specific "SKU," or "stock keeping unit," for inventory tracking purposes.[35] Each of those SKUs should have been mapped to a sales tax code and uploaded to OCL's

---

[31] *Id.*

[32] Compl. ¶ 37.

[33] Compl. ¶ 38.

[34] Compl. ¶ 42.

[35] Compl. ¶ 43.

sales and use tax reporting software called Avalara.[36] With a properly assigned

SKU, Avalara could determine the state in which the customer was located along

with the corresponding tax code mapping table, whether state sales or use tax should

be applied to the sale transaction and, if so, at what rate.[37] The sales or use tax

amount would then be added to the customer's invoice through Magento or any other

sales platform used, and OCL would collect the sales and use taxes paid by the

customer upon checkout online or by traditional invoice.[38]

Avalara's "AvaTax" system also provided a wide range of product "codes"

that OCL would select for each of its products to categorize them by type (e.g., live

class, course material, etc.).[39] Each "code" would enable Avalara to determine at

customer checkout whether the product sold, as identified by SKU, was subject to

the customer state's sales and use tax and, if so, at what rate.[40] The efficacy of this

system depended upon proper inputs; if OCL failed properly to map out and code its

product offerings by product type in Avalara, SKUs could be mapped to an incorrect

---

[36] Compl. ¶¶ 3, 43.

[37] Compl. ¶ 43.

[38] *Id.*

[39] Compl. ¶ 45.

[40] *Id.*

10

code, or none at all, resulting in the failure to collect applicable sales and use taxes from the customer upon checkout.[41]

As early as June 2015, OCL discovered that it was not using Avalara properly (the "Avalara Issue"), including by failing to: (1) connect AvaTax to the online sales platforms of entire subsidiaries and product lines of OCL; (2) track inventory by improperly assigning SKUs to thousands of products sold by OCL, which was not charging sales tax to the purchaser of the products, regardless of applicable tax laws; and (3) properly code products with SKUs in the Avalara system for purposes of identifying and collecting applicable state sales and use taxes from its customers.[42] These miscues resulted in significant state sales and use taxes that were not collected and/or remitted over a period of several years.[43] On June 8, 2018, as the sale process was underway, Wilson informed Sheahan that OCL would retain an outside accounting firm, Thompson Tax, to investigate the Avalara Issue.[44]

Of the roughly 9,000 SKUs eligible for processing in Avalara, only 400 or so were assigned a code in AvaTax that would allow the software to compute and

---

[41] *Id.*

[42] Compl. ¶ 46.

[43] Compl. ¶ 47.

[44] Compl. ¶¶ 47, 50.

11

collect applicable sales and use tax.[45] This failure caused a significant portion of OCL's revenue streams to be free of taxation.[46] Indeed, despite gross revenues of over $300 million between 2014 and June 2018, OCL had remitted only about $168,000 in sales and use taxes to state taxing authorities—substantially less than the amount OCL should have expected to pay for the sales of its products during that time.[47] Harris Williams advised the CIP Working Group (including Formica and Wilson) of the magnitude of the Avalara Issue by email on August 14, 2018, only days before the SPA was signed.[48]

## D. Defendants' Inconsistent Disclosures Across Bidders

On July 16, 2018, after reviewing the documents and other information assembled in the universal data room by Harris Williams, Formica instructed Harris Williams that only certain categories of data should be included in particular data rooms made available to particular bidders, including Bertelsmann.[49] In keeping with the practice of disclosing information to some bidders but not others, on or about August 15, 2018, the CIP Working Group provided "another bidder" with

---

[45] Compl. ¶ 48.

[46] *Id.*

[47] Compl. ¶ 49.

[48] *Id.*

[49] Compl. ¶ 51.

information concerning the scope and severity of the Avalara Issue and OCL's estimated sales and use tax liability.[50] With this information in hand, the other bidder informed the CIP Working Group, including Lipton, Formica, Sheahan and Wilson, that it estimated OCL's sales and use tax liability exposure to be in the range of $8–9 million.[51] Consequently, as a condition to pursuing the acquisition further, the other bidder required either a substantial one-year escrow of at least $15 million for OCL's sales and use tax liability, or a reduction in the purchase price based on Thompson Tax's final analysis of the full scope of OCL's sales and use tax liability in the pre-closing period.[52] Lipton ultimately rejected this proposal.[53]

### E. Bertelsmann Executes the SPA

Bertelsmann emerged as the successful bidder and executed the SPA on August 20, 2018, in advance of the closing on November 1, 2018.[54] Under the SPA, Bertelsmann purchased all of the outstanding shares of OCL Holdings from

---

[50] Compl. ¶ 54. The identity of the "other bidder" is not disclosed in the Complaint.

[51] Compl. ¶ 55.

[52] Compl. ¶ 56.

[53] *Id.*

[54] Compl. ¶ 1. Under an Assignment and Assumption Agreement dated September 10, 2018, Plaintiff OHN assigned to Bertelsmann Professional Learning LLC all of its rights, benefits and obligations under, and all of its interests in, the SPA. Plaintiff Bertelsmann is the successor by merger to Bertelsmann Professional Learning LLC. Compl. at 3 n.1.

CIP OCL.[55] As is typical in stock purchase agreements between sophisticated parties, both OCL Holdings and CIP OCL made certain representations and warranties in Articles III and IV of the SPA, respectively.[56] Relevant here, the Company represented in Section 3.11(a) of the SPA that all tax returns had been "duly and timely" filed and were "true, complete and correct in all material respects."[57] In Section 3.5, it represented that it had no undisclosed liabilities.[58] And finally, in Section 3.6, it represented that there were no material changes to the Company or its subsidiaries' accounting policies and practices with respect to "collections of accounts receivable."[59]

Bertelsmann represented, in turn, that it was "provided adequate access to the properties, premises and records of the Company and each Company Subsidiary for the purpose of [its] review" and that it did not rely on "any representation or warranty by, or information from, the Seller, the Company," or anyone else, "whether oral or written, express or implied, . . . except for the representations and warranties specifically and expressly set forth in Article III and Article IV" (the "anti-reliance"

---

[55] Compl. ¶ 1.

[56] SPA art. III, IV.

[57] *Id.* § 3.11(a).

[58] *Id.* § 3.5.

[59] *Id.* § 3.6(g).

clause).[60]  This language was reiterated in Section 5.10.[61]  Bertelsmann also agreed that there were no other representations or warranties other than those expressly made in Articles III and IV of the SPA.[62]

As is also typical in agreements of this sort, the SPA contains provisions that purport to limit the parties' liability for legal claims arising out of the agreement. In Section 10.1 (the "survival clause"), the parties agreed that all representations and warranties in the agreement "terminate effective as of the Closing and shall not survive the Closing for any purpose, and thereafter there shall be no liability on the part of" any party involved in the sale.[63]  Section 11.16 (the "non-recourse provision") further provides that: the SPA may only be enforced against "the Parties and their respective successors and permitted assigns"; claims arising out of the SPA may only be asserted against "the Persons that are expressly identified as Parties and

---

[60] *Id.* § 5.7.

[61] *Id.* § 5.10 ("[T]he transactions contemplated hereby by Buyer are not done in reliance upon any representation or warranty by, or information from, the Seller, the Company, any Company Subsidiary or any of their respective Affiliates, employees or representatives or any other Person, whether oral or written, express or implied . . . except for the representations and warranties specifically and expressly set forth in Article III and Article IV . . . .").

[62] *Id.* § 3.20 ("[N]one of the Company, any Company Subsidiary, Seller or any other Person makes or has made any representations or warranties whatsoever, express or implied, as to the Company, any Company Subsidiary, Seller or the transactions contemplated hereby beyond those expressly given by Seller in Articles III and IV . . . .").

[63] *Id.* § 10.1.

15

their respective successors and permitted assigns"; and "no officer, director, partner, manager, equityholder, employee or Affiliate of any Party . . . will have any liability or obligation with respect to [the SPA] or with respect to any claim or cause of action (whether in contract, tort or otherwise)" arising out of or related to the SPA "(including a representation or warranty made in connection with [the SPA] or as an inducement to enter into [the SPA])."[64]

In the event of a post-closing dispute concerning the closing price, Section 2.4 sets forth a detailed process for post-closing adjustments to the estimated purchase price (the "Estimated Purchase Price").[65] In this regard, the parties agreed to both a "Base Purchase Price" of $525 million and a mechanism to adjust the Base Purchase Price after Closing based on a mutual determination that certain components of the Company's financials, and primarily its "Working Capital," should be adjusted.[66] In other words, the parties agreed that the "Final Purchase Price" would be determined by making a Working Capital adjustment to the Base Purchase Price after Closing.[67]

---

[64] *Id.* § 11.16.

[65] Compl. ¶ 11.

[66] SPA § 2.2.

[67] *See id.* §§ 2.2, 2.4.

16

The SPA defines Working Capital as "Current Assets minus Current Liabilities," and Current Liabilities is defined to expressly exclude tax liabilities.[68] The provision provides that the parties are to negotiate their disputes regarding the calculation of various items that comprise the purchase price in good faith,[69] but if the parties cannot reach an agreement, then they "shall jointly" submit their claims to an independent accounting firm (the "Accounting Firm") to settle the dispute on the final purchase price and its respective items.[70] According to the SPA, the parties agreed to the Working Capital adjustment—and the procedures for having Working Capital disputes resolved by an Accounting Firm—in the following three-step sequence.

*First*, at least four business days prior to the Closing Date, Seller must deliver to the Buyer an "Estimated Closing Statement."[71] That statement must include, *inter alia*, "an estimated balance sheet of the Company . . . prepared in good faith by the Company, together with a good faith estimate of" certain amounts pertaining to the finances of the Company, including "the amount of Working Capital as of the

---

[68] *Id.* § 1.1 (defining "Current Liabilities" to "exclude any items constituting Indebtedness, Debt-Like Items, Transaction Expenses or Tax liabilities").

[69] *Id.* § 2.4(a).

[70] *Id.* § 3.4(b)(ii).

[71] *Id.* § 2.2.

17

Closing Balance Sheet Date" and the "Estimated Purchase Price" resulting from that calculation.[72]  At Closing, the Buyer, among other things, must pay to the Seller the Estimated Purchase Price (subject to certain conditions).[73]

*Second*, within 90 days after the Closing Date, the Buyer must deliver to the Seller a "Closing Statement."[74]  That statement must include the Buyer's "good faith determination" of certain components of the Company's finances, including the Company's actual Working Capital, as well as the supporting material used to prepare the Closing Statement.[75]

The SPA provides that the Estimated Closing Statement and the Closing Statement are required to be "calculated in accordance with the Accounting Principles," which is defined to mean "GAAP and the accounting principles, policies, procedures, practices, applications and methodologies consistently applied in preparing the Financial Statements."[76]  In the event of any discrepancy with

---

[72] *Id.*

[73] *Id.* § 2.3.

[74] *Id.* § 2.4.

[75] *Id.*

[76] *Id.* § 1.1.

18

GAAP, then "the accounting principles . . . applied in preparing the Financial Statements shall take precedence."[77]

*Third*, Seller can either accept the amount Buyer included in the Closing Statement (thereby finalizing the Final Purchase Price through adjusting the Base Purchase Price by the undisputed "final" amounts in the Closing Statement) or dispute the amounts in the Closing Statement.[78] If Buyer elects to dispute the Closing Statement, then Buyer and Seller shall first negotiate in good faith to resolve any disputed items before submitting remaining disputed items to a mutually agreed-upon independent Accounting Firm for resolution.[79]

In the final provision relevant here, Section 11.3 (the "savings clause"), the parties agreed that, "[u]pon determination" that any provision in the SPA is unlawful or against public policy, the parties agree that "all other provisions of this Agreement . . . shall nevertheless remain in full force and effect."[80] The savings clause also contemplated that the parties would negotiate to reform any illegal

---

[77] *Id.*

[78] *Id.* §§ 2.4(b)(i), 2.4 (b)(iii) & (d).

[79] *Id.* § 2.4(b)(iii).

[80] *Id.* § 11.3.

provision to comply with the law while maintaining the original intent of the provision.[81]

## F. Bertelsmann's Post-Signing Due Diligence

Before closing, Bertelsmann and other potential bidders were conducting due diligence into all phases of OCL's operations, including its sales and use tax policies and procedures and any potential liability to state tax authorities.[82] This due diligence period extended through the execution of the SPA on August 20, 2018, and through closing on November 1, 2018.[83] In the course of Bertelsmann's diligence, no information concerning Thompson Tax, its ongoing sales and use tax analysis, or any of its work product as provided to OCL in the course of its investigation of the Avalara Issue was included among the data room materials or otherwise disclosed to Bertelsmann prior to closing.[84]

After closing, on January 29, 2019, Bertelsmann sent to CIP OCL its Closing Statement with supporting documentation, prepared in accordance with Section 2.4 of the SPA, setting forth Bertelsmann's determination of the: (i) Closing Cash, (ii) Closing Indebtedness, (iii) Closing Transaction Expenses, (iv) Closing Debt-

---

[81] *Id.*

[82] Compl. ¶ 53.

[83] *Id.*

[84] Compl. ¶ 52.

Like Items, and (v) Closing Working Capital.[85]  According to the Closing Statement, Buyers were owed $17,680,000 from CIP OCL under Section 2.4 of the SPA for adjustments to the closing price.[86]  At this time, however, Bertelsmann had not yet discovered the existence, much less the extent, of Defendants' alleged fraud, and believed the parties were negotiating in good faith over errors in the closing calculation.[87]

CIP OCL responded by claiming that Bertelsmann's January 29 letter did not constitute a proper Closing Statement under the SPA because it failed to include "reasonable supporting or underlying documentation used in the preparation thereof," as required by the SPA.[88]  On February 8, Bertelsmann provided additional information and documentation supporting its calculations, and explained that it had identified: (1) irregularities in OCL's accounts receivable, (2) incorrect recognition of revenue, (3) failure to include variable compensation payments as current liabilities and (4) failure to comply with tax laws.[89]

---

[85] Compl. ¶ 76; *id.* Ex. 2.

[86] Compl. ¶ 11.

[87] Compl. ¶ 88.

[88] Compl. ¶ 77.

[89] Compl. ¶¶ 79–88.

On February 18, CIP OCL advised Bertelsmann that, because the issues Bertelsmann had identified regarding accounts receivable, deferred revenue and variable compensation payments calculations were irrelevant to Working Capital under the SPA, CIP OCL "will not engage in any discussion or negotiation around any adjustments related thereto."[90] CIP OCL did agree to review one discrete issue (the estimate to actual differences calculation), but threatened litigation if Bertelsmann continued to pursue its working capital adjustment claim (as delineated) under the SPA.[91]

In response, Bertelsmann proposed that the parties agree upon which issues should be submitted to the Accounting Firm and which should be excluded and reserved for resolution in accordance with the SPA's forum selection clause.[92] CIP OCL initially agreed, and Bertelsmann drafted a stipulation noting which issues were properly before the Accounting Firm and which should be litigated in court.[93] Upon receipt of the draft stipulation, however, CIP OCL took the position that the entire dispute should be presented to the Accounting Firm.[94]

---

[90] Compl. ¶ 89.

[91] *Id.*

[92] Compl. ¶ 94.

[93] Compl. ¶ 95.

[94] *Id.*

Once Bertelsmann discovered the full extent of Defendants' fraudulent scheme through its post-closing investigation of OCL's records, it realized that the Accounting Firm could not resolve the majority of its post-closing claims.[95] Specifically, Bertelsmann's review of OCL's internal communications and books and records led to its discovery of Defendants' misrepresentations in the SPA, and Bertelsmann concluded OCL's financial and accounting irregularities were not the product of mere negligence or sloppy bookkeeping, but rather resulted from Defendants' intentional misrepresentations.[96] While Defendants maintain that all of Bertelsmann's claims in the Closing Statement should be submitted to the Accounting Firm before being litigated, Bertelsmann's position in this litigation is that Buyer's claims related to fraudulent inducement cannot be adjudicated by the Accounting Firm under the SPA or applicable Delaware law.[97]

## G. Procedural History

Bertelsmann filed its original complaint in the Superior Court on July 2, 2019.[98] Following the Superior Court's May 28, 2020 decision granting Defendants' motion to transfer the case to Chancery under 10 *Del. C.* § 1902, on

---

[95] Compl. ¶¶ 88, 96.

[96] *Id.*

[97] Compl. ¶ 100.

[98] Compl. ¶ 96.

August 6, 2020, Plaintiffs filed their Verified Complaint in this Court.[99] On September 14, 2020, Defendants filed their motion to dismiss the Verified Complaint.[100]

On October 5, 2020, Defendants' counsel sent a letter to Plaintiffs' counsel expressing the position that the parties' entire dispute should be submitted to the Accounting Firm, including Plaintiffs' fraudulent inducement claim.[101] Plaintiffs informed Defendants by letter dated October 12, 2020, that because the Buyer's fraudulent inducement and related claims cannot be adjudicated by the Accounting Firm, the Buyer does not seek to submit the "entire" dispute over the Closing Statement to the Accounting Firm, but rather only those components of the Closing Statement that are not part of Plaintiffs' fraudulent inducement and related claims.[102]

On October 14, 2020, Plaintiffs filed their Verified Amended Complaint (the "Complaint"), which is the operative pleading.[103] The Complaint comprises five Counts. Count I asserts fraud in the inducement against CIP OCL and CIP Capital based on the allegedly false representations provided by CIP OCL to

---

[99] Compl. ¶ 97.

[100] *Id.*

[101] Compl. ¶ 98.

[102] Compl. ¶ 100.

[103] D.I. 16.

induce Bertelsmann into closing the SPA.[104]  Count II asserts a claim for aiding and abetting that fraud against the Individual Defendants.[105]  Count III asserts a claim for civil conspiracy relating to the fraud against all Defendants.[106]  Count IV asserts a claim for unjust enrichment against CIP OCL, CIP Capital, Sheahan and Wilson as a basis to seek disgorgement of ill-gotten profits.[107]  And Count V seeks a declaratory judgment against CIP OCL concerning which components of Bertelsmann's claim for adjustments to the Estimated Purchase Price must be submitted to the Accounting Firm for resolution under the SPA.[108]  Defendants have moved to dismiss all Counts under Chancery Rule 12(b)(6) and, after briefing and oral argument, the matter was submitted for decision on April 15, 2021.[109]

---

[104] Compl. ¶¶ 104–17.

[105] Compl. ¶¶ 118–25.

[106] Compl. ¶¶ 126–33.

[107] Compl. ¶¶ 134–40.

[108] Compl. ¶¶ 141–44.

[109] D.I. 23 (Defs.' Opening Br. in Supp. of Their Mot. to Dismiss the Verified First Am. Compl.) ("DOB"); D.I. 29 (Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss) ("PAB"); D.I. 33 (Defs.' Reply Br. in Supp. of Their Mot. to Dismiss the Verified First Am. Compl.) ("DRB"); D.I. 45 (Tr. of Apr. 15, 2021, Oral Arg. on Defs.' Mot. to Dismiss) ("Oral Arg. Tr.").

## II. ANALYSIS

Chancery Rule 12(b)(6) requires dismissal of a complaint when the plaintiff is unable to state a legally viable claim under "any reasonably conceivable set of circumstances susceptible of proof" based on the complaint's well-pled facts.[110] While the court need not accept a complaint's conclusory allegations, or "every strained interpretation of the allegations proposed by plaintiff,"[111] it "must accept as true all well-pled allegations in the complaint and draw all reasonable inferences from those facts in plaintiff's favor."[112]

### A. Count I – Fraudulent Inducement through Contractual Fraud

In Count I, Plaintiffs allege that several representations and warranties within the SPA were knowingly false when made in order fraudulently to induce Bertelsmann into executing the SPA and consummating its acquisition of OCL Holdings.[113] In this regard, Section 5.7 of the SPA makes clear that Bertelsmann relied on the representations made by CIP OCL in Article III of the SPA.[114] There, the Company represented that all taxes due and payable by the

---

[110] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006).

[111] *Id.*

[112] *In re Rouse Props., Inc.*, 2018 WL 1226015, at *10 (Del. Ch. Mar. 9, 2018).

[113] Compl. ¶¶ 57–58.

[114] SPA § 5.7

26

Company and the Company Subsidiaries have been fully and timely paid (Section 3.11), each of the Company's financial statements were duly prepared and true, correct and complete in all material respects (Section 3.4), and that the Company had no undisclosed liabilities (Section 3.5).[115]

To state a claim for fraudulent inducement, a plaintiff must well plead "(1) a false statement or misrepresentation; (2) that the defendant knew was false or made with reckless indifference to the truth; (3) the statement induced the plaintiff to enter the agreement; (4) the plaintiff's reliance was reasonable; and (5) the plaintiff was injured as a result."[116] Chancery Rule 9(b) requires that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."[117] The relevant circumstances include "the time, place, and contents of the false representations; the facts misrepresented; the identity of the person(s) making the misrepresentation; and what that person(s) gained from making the misrepresentation."[118] "Essentially, to satisfy that [particularity] requirement, the plaintiff must allege circumstances sufficient to

---

[115] *See id.* §§ 3.11, 3.4, 3.5.

[116] *ITW Glob. Invs. Inc v. Am. Indus. P'rs Cap. Fund IV, L.P.*, 2017 WL 1040711 (Del. Super. Ct. Mar. 6, 2017) (internal quotations omitted).

[117] Del. Ch. Ct. R. 9(b).

[118] *Trenwick Am. Litig. Tr. v. Ernst & Young LLP*, 906 A.2d 168, 207–08 (Del. Ch. 2006) (Strine, V.C.), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billet*, 931 A.2d 438 (Del. 2007).

fairly apprise the defendant of the basis for the claim."[119] Though Chancery Rule 9(b) requires that the circumstances of fraud be pled with particularity, "[m]alice, intent, knowledge and other condition of mind of a person may be averred generally."[120]

Defendants seek dismissal of Count I on two principal grounds. First, Defendants argue Plaintiffs have failed to satisfy Rule 9(b)'s particularity requirements. Second, Defendants maintain that even if the fraud claim is pled with particularity, Plaintiffs agreed to limits in the SPA that preclude the prosecution of fraud claims against certain of the Defendants at any time, and preclude the prosecution of any fraud claim, whether extra-contractual or contractual, after the transaction closed. I address both arguments in turn.

### 1. Count I is Pled with Sufficient Particularity

"When a party sues based on a written representation in a contract . . . it is relatively easy to plead a particularized claim of fraud."[121] "This is because the plaintiff can readily identify who made what representations where and when,

---

[119] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 145 (Del. Ch. 2003).

[120] Del. Ch. Ct. R. 9(b).

[121] *Agspring Holdco, LLC v. NGP X US Hldgs., L.P.*, 2020 WL 4355555, at *13 (Del. Ch. July 30, 2020) (internal quotations omitted).

because the specific representations appear in the contract."[122]  Plaintiffs have identified the specific false representations contained in the SPA, including when the SPA was signed and how Defendants induced Bertelsmann to accept a significantly overinflated price in reliance upon these false representations.[123]

"Having pointed to the representations, the [Plaintiffs] need only allege facts sufficient to support a reasonable inference that the representations were knowingly false."[124]  As noted, knowledge may be averred generally, meaning Plaintiffs "need only point to factual allegations making it reasonably conceivable that the defendants charged with fraud knew the statement was false."[125]  Plaintiffs easily meet this standard.

The Complaint alleges that the Individual Defendants were all members of the CIP Working Group: Formica and Lipton were representatives for CIP Capital, while Sheahan and Wilson were acting on behalf of OCL.[126]  The Complaint further

---

[122] *Id.* (internal quotations omitted).

[123] Compl. ¶¶ 51–61, 64–71.

[124] *Prairie Cap. III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 62 (Del. Ch. 2015).

[125] *Kainos Evolve, Inc. v. InTouch Techs., Inc.*, 2019 WL 7373796, at *4 (Del. Ch. Dec. 31, 2019).

[126] Compl. ¶ 34.  Another bidder is alleged to have expressly "informed the CIP Working Group, including Defendants Lipton, Formica, Sheahan and Wilson, that it estimated OCL's sales and use tax liability exposure to be in the range of $8 to $9 million," and then demanded "a substantial one-year escrow of at least $15 million for OCL's sales and use

29

alleges that the CIP Working Group's financial advisor initially informed Formica and Lipton of the Avalara Issue and then advised all CIP Working Group members of the scope of the problem.[127] Moreover, as members of the CIP Working Group, Formica and Lipton "routinely participated in OCL's annual, monthly and special board meetings, monitored and reviewed OCL's financial performance, and routinely discussed matters relating to OCL's financial performance and related matters with [ ] Sheahan, Wilson, and other officers and employees of OCL."[128] Indeed, Sheahan and Wilson are alleged to have "direct[ed] finance staff to depart from OCL's standard accounting practices and refrain from writing off uncollectible accounts receivable in the period prior to the execution of the SPA" to inflate the Company's EBITDA.[129] They also repeatedly attempted to solve the Avalara Issue, to no avail.[130] These allegations suffice to allow a reasonable inference that all of the Individual Defendants knew of the SPA's misrepresentations.[131] Because

---

tax liability as a condition of its bid for OCL," which Lipton ultimately rejected. Compl. ¶¶ 55–56.

[127] Compl. ¶ 36, 48–49. Formica and Wilson are also alleged to have discussed with another bidder for OCL issues relating to OCL's SKU assignment. Compl. ¶ 54.

[128] Compl. ¶ 30.

[129] Compl. ¶¶ 7–9, 64–71.

[130] Compl. ¶¶ 47, 50.

[131] *See Prairie Cap.*, 132 A.2d at 64–65 (denying motion to dismiss individual defendants where "the Prairie Capital Directors oversaw the sale process as part of the working group," "actively participated in the creation and approval of the information that was distributed

knowledge of the wrongdoing by officers or directors can be imputed to the corporation,[132] Plaintiffs well plead particularized allegations of knowledge against CIP Capital and OCL.[133]

### 2. The Contract Does Not Bar the Fraud Claim as a Matter of Law

Defendants' showcase argument in support of their motion to dismiss Plaintiffs' fraud claim is that the SPA expressly dissembles the claim through at least two bargained-for limits. First, Defendants contend that the survival clause expressly provides that the representations and warranties terminate upon closing, and therefore any claim (including a fraud claim) arising from those reps and warranties was extinguished when the deal closed. Second, even if the Court finds

---

to buyers," and "were 'actively and closely involved in choreographing discussions with potential acquirers,'" including "information that should be posted to the Data Room and disseminated"); *Agspring*, 2020 WL 4355555, at \*17–18 (denying entity's motion to dismiss fraud claim based on allegations of its members/managers' control of the entity, their attendance at board meetings and regular receipt of information (including financial information) relating to the alleged fraud, their being closely involved in the sales process, their understanding of the importance of EBITDA to the deal, and their "constantly communicat[ing]" with the sales team during the sales process, and pushing "to close the deal," all of which were "far more than sufficient to support a reasonable inference that NGP (the entity) was in a position to know when it signed the MIPCA the knowable reality underlying the falsity of the representations").

[132] *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at \*27 (Del. Ch. Nov. 17, 2014) ("Delaware courts consistently have imputed to a corporation the knowledge of an officer or director of the corporation when acting on its behalf." (quoting *B.A.S.S. Gp., LLC v. Coastal Supply Co.*, 2009 WL 1743730, at \*7 n.72 (Del. Ch. June 19, 2009))).

[133] Compl. ¶¶ 18–21; 28–32; 34–38; 47–52; 54–57. I mention CIP Capital Fund and CIP OCL because Plaintiffs' allegations of fraud are directed only to those two parties. Compl. ¶¶ 104–17.

31

the limitations clause does not bar Plaintiffs' fraud claim altogether, Defendants argue the SPA's anti-reliance and non-recourse provisions work together to bar Plaintiffs' fraud claim against CIP Capital. In response, Plaintiffs maintain that where, as here, a plaintiff alleges a seller made fraudulent representations within a contract with the seller's affiliates' knowing participation, Delaware law will not countenance the seller's or its affiliates' attempt to escape the consequences of their fraud by pointing to other provisions within the same fraudulently-procured contract that purport to limit the seller's liability.

In apparent recognition of its importance to the outcome of the dismissal bid, the parties devote substantial energy to their respective explications *de texte* of the seminal *ABRY Partners*. Because I agree that *ABRY Partners*, by extension, is dispositive here, I provide my own explication *de texte* of the decision before turning to its specific application to the SPA and Plaintiffs' fraud claim.

### a. *ABRY Partners* and its Progeny

In *ABRY Partners*, then-Vice Chancellor Strine used a motion to dismiss fraud claims brought by a displeased buyer seeking to rescind a stock purchase agreement as a palette from which to paint a multi-layered landscape depicting sustainable and unsustainable post-closing breach of contract and fraud claims.[134] The plaintiff in

---

[134] *ABRY P'rs*, 891 A.2d 1032.

32

the case alleged that the management for both the private equity seller and the to-be-sold portfolio company worked together to manipulate the portfolio company's financial statements in order fraudulently to induce the buyer into purchasing the company at an inflated price.[135] The alleged fraud comprised both extra-contractual misrepresentations and knowingly false contractual reps and warranties that mischaracterized the true state of the portfolio company's business.

The defendants' motion to dismiss was grounded in the plain terms of the stock purchase agreement memorializing the parties' bargain, which contained broad anti-reliance, limited remedy and limitation of liability provisions that defendants argued foreclosed the buyer's claims.[136] Like Defendants here, the defendants in *ABRY Partners* appealed to the court's contractarian instincts and urged the court to hold the plaintiffs to their bargain, which carefully limited the warranties made by the private equity seller and distinguished them from the separate warranties made by the portfolio company itself.[137] The contract also explicitly precluded the buyer from suing the seller for fraud in court, confining the buyer to the "sole and exclusive

---

[135] *Id.* at 1038.

[136] *Id.* at 1064.

[137] *Id.* at 1034, 1042–43.

remed[y]" of asserting a claim for indemnity in arbitration with damages capped at 4% of the purchase price.[138]

The court found the agreement's terms plainly barred the rescission claim, but held that the "strong American tradition of freedom of contracts"—which is as robust in Delaware as anywhere—must give way to Delaware's venerable public policy against fraud, rooted fundamentally in "the societal consensus that lying is wrong."[139] In doing so, the court endeavored to place both laudable interests— respect for freedom of contract and the law's abhorrence of fraud—on a double-pan balance in an effort to calibrate Delaware law regarding the viability of claims of fraud in the face of express contractual limitations on post-closing liability.

On one pan, the court placed evidence of the long tradition of both common law and equity judges giving due respect to private ordering and the carefully negotiated ways in which parties allocate risk within a contract.[140] This tradition is particularly rich in cases where sophisticated parties have made informed judgments about the risk they should bear in their contract and the due diligence they undertake,

---

[138] *Id.* at 1035, 1044.

[139] *Id.* at 1036, 1059.

[140] *Id.* at 1061–62.

in recognition that these parties are able to price factors such as contractual limits on liability into the purchase price.[141]

On the other pan, the court placed evidence of our law's strong and storied intolerance of fraud.[142] In this regard, the court pointed to longstanding decisional law and scholarly commentary as authority for the proposition that "[a contractual] term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy."[143] As the Second Circuit explained in *Turkish v. Kasenetz*,[144] "the rationale behind the doctrine—to prevent parties from shielding themselves from liability from their own fraud by inserting a clause into the very contract that was procured by the fraud—applies equally to the limitation of liability and to the exclusion of liability."[145] According to *ABRY Partners*, "[t]his sort of reasoning draws in no small measure from the nostrum *fraus omnia corrumpit*—fraud vitiates everything it touches."[146]

---

[141] *Id.* at 1061. Indeed, the court observed that Delaware judges should be reluctant to be more restrictive of freedom of contract than our General Assembly has been, pointing to statutes that allow alternative entities (typically associated with more sophisticated parties) to eliminate fiduciary duties by contract. *Id.* at 1063–64.

[142] *Id.* at 1059.

[143] *Id.* (assembling authority and quoting Restatement (Second) of Contracts § 195 (1981)).

[144] 27 F.3d 23 (2d Cir.1994).

[145] *Id.* at 28.

[146] *ABRY P'rs*, 891 A.2d at 1059.

Having accounted for both competing interests, the court in *ABRY Partners* struck the balance thusly: where a plaintiff seeks to hold a defendant liable for alleged lies made *outside* the contract, a party's clear contractual promise disclaiming reliance on such extra-contractual statements will bar that claim.[147] As the court explained, "[c]ontractually binding, *written* representations of fact ought to be the most reliable of representations, and a law intolerant of fraud should abhor parties that make such representations knowing they are false."[148] In other words, where a party states in writing that he did not rely on representations only later to come to the court with a fraudulent inducement claim where he alleges, "but [I] did rely on those other representations," that party reveals himself as a liar in his own right and so has no basis to claim harm from fraud.[149]

Similarly, the court held that a seller could allocate the risk of intentional lies by *other* parties to the buyer, so long as it did not know of the lies.[150] This, the court

---

[147] *Id.* at 1057–58.

[148] *Id.* at 1057 (emphasis added).

[149] *Id.* at 1057–58.

[150] *Id.* at 1062–63. I use the word "know" because, in discussing the seller's ability to insulate itself from the statement of others, the court was careful to state that it would be "legitimate for the Seller to create exculpatory distance between itself and the Company" where it allocated the risk of intentional lies to the Company's managers and the seller did not "kn[o]w that the Company's contractual representations and warranties were false . . . ." *Id.* at 1062–64. Indeed, the court expressly recognized that "[t]he Seller [in *ABRY Partners*] did not necessarily possess the same information as the managers of the Company" and yet denied the seller's motion to dismiss, describing the burden of proof

reasoned, properly "respect[ed] the ability of sophisticated businesses, such as the Buyer and Seller, to make their own judgments about the risk they should bear and the due diligence they undertake, recognizing that such parties are able to price factors such as limits on liability."[151]

Where, however, an agreement purports to limit liability for a lie made within the contract itself, and parties *know* of the lie, such parties cannot skirt liability through contractual limits within the very contract they procured by fraud.[152] Practically, the court reasoned, "there is little support for the notion that it is efficient to exculpate parties when they lie about the material facts on which a contract is premised," and unlike negligent or even reckless misrepresentations, a seller who *knows* of the lies cannot disclaim liability out of ignorance.[153] Stated differently, "there is a moral difference between a lie and an unintentional misrepresentation of fact," and the *fraus omnia corrumpit* strain of cases demonstrate "that courts [] find it distasteful to enforce contracts excusing liars for responsibility for the harm their lies caused."[154] With this in mind, the court held:

---

on the buyer as requiring that they show the seller's "knowledge of falsity." *Id.* at 1063–64.

[151] *Id.* at 1061–62.

[152] *Id.* at 1063.

[153] *Id.* at 1062.

[154] *Id.*

To the extent that the Stock Purchase Agreement purports to limit the Seller's exposure for its own conscious participation in the communication of lies to the Buyer, it is invalid under the public policy of this State. That is, I find that the public policy of this State will not permit the Seller to insulate itself from the possibility that the sale would be rescinded if the Buyer can show either: 1) that the Seller knew that the Company's contractual representations and warranties were false; or 2) that the Seller itself lied to the Buyer about a contractual representation and warranty. This will require the Buyer to prove that the Seller acted with an illicit state of mind, in the sense that the Seller knew that the representation was false and either communicated it to the Buyer directly itself or knew that the Company had.[155]

If, however, the buyer can only demonstrate that "the Company's managers intentionally misrepresented facts to the Buyer without knowledge of falsity by the Seller, then the Buyer cannot obtain rescission or damages, but must proceed with an Indemnity Claim subject to the Indemnity Fund's liability cap."[156] While the court noted that its ruling left a "residual double liar problem" unaddressed, it ultimately viewed that concern to be "far less compelling" in the context of contractual fraud because fraud within the contract presents "no evidentiary

---

[155] *Id.* at 1064. I note that, while the court's statement in *ABRY Partners* that "the public policy of this State will not permit the Seller to insulate itself from the possibility that the sale would be *rescinded*" if the Buyer alleges "that the Seller knew that the Company's contractual representations and warranties were false," courts have applied its rationale to claims for damages and rescission alike. *See Prairie Cap.*, 132 A.3d at 60–65.

[156] *ABRY P'rs*, 891 A.2d at 1064.

uncertainty over whether the allegedly false representations were made, only over whether they were materially false and whether the seller knew them to be false."[157]

*ABRY Partners*' thorough and thoughtful treatment of post-closing fraud claims is now engrained in Delaware's common law.[158] Courts have applied its holding to find that clear anti-reliance clauses undercut the element of reliance when a plaintiff's fraud claims rest on extra-contractual statements.[159] Conversely, courts have pointed to *ABRY Partners* when rejecting a seller's effort to employ contractual limits to defeat a buyer's contractual fraud claim.[160] And our courts have endorsed *ABRY Partners'* holding that a "seller can be liable for the false contractual representations of 'the company' if the buyer adequately pleads the seller's

---

[157] *Id.* at 1064 n.85. The "double liar problem" arises when the buyer promises not to sue for rescission even if the seller "lied about . . . the accuracy of a contractual representation," and then sues on the contractual fraud nevertheless. *Id.*

[158] *RAA Mgmt., LLC v. Savage Sports Hldgs., Inc.*, 45 A.3d 107, 118–19 (Del. 2012) ("*ABRY Partners* accurately states Delaware law. . . ."); *EMSI Acquisition, Inc. v. Contrarian Funds, LLC*, 2017 WL 1732369, at *8 (Del. Ch. May 3, 2017) ("*ABRY* provides a solid framework within which to analyze the arguments of buyers and sellers who seek to exploit the risk allocation provisions of their transactional agreements, bargained-for on a clear day but deployed in the midst of post-closing controversy.").

[159] *See, e.g.*, *Pilot Air Freight, LLC v. Manna Freight Sys., Inc.*, 2020 WL 5588671, at *21 (Del. Ch. Sept. 18, 2020) ("*ABRY* offers the following guidance: do not disavow reliance on extra-contractual statements unless you mean it.").

[160] *See, e.g.*, *ChyronHego*, 2018 WL 3642132, at *8 (applying *ABRY Partners* and holding that contractual anti-reliance language does not defeat a claim for contractual fraud); *Aveanna Healthcare, LLC v. Epic/Freedom, LLC*, 2021 WL 3235739, at *16 (Del. Super. Ct. July 29, 2021) (same).

knowledge of the company's misrepresentations."[161] In *Prairie Capital III L.P. v. Double E Holding Corp.*, for example, Vice Chancellor Laster allowed a contractual fraud claim against a private equity fund and its managers to survive a motion to dismiss even though they did not make the allegedly fraudulent contractual misrepresentations on behalf of the target company.[162] The court reasoned that, "[a]lthough under the terms of the stock purchase agreement only the company made the representations, the scope of a claim for contractual fraud [sweeps] more broadly[]" to cover those who *knew* that such representations were false.[163] As Vice Chancellor Laster explained, "[f]lesh and blood humans also can be held

---

[161] *Id.*; *see also Prairie Cap.*, 132 A.3d at 61 (holding individual defendants "Fortin and Vancura can be held liable for fraudulent contractual representations made by the Company because the Counterclaim sufficiently alleges that they knew that the representations were false."); *LVI Gp. Invs., LLC v. NCM Gp. Hldgs., LLC*, 2018 WL 1559936, at *13 (Del. Ch. Mar. 28, 2018) ("As the EPP Defendants point out, the representations and warranties in the agreement were made by NCM, not the Individual Defendants. But that is not fatal to LVI's fraud claims. The question is whether LVI has pleaded facts suggesting that the falsity of the financial statements 'was knowable and that the defendants[s] w[ere] in a position to know it.'").

[162] 132 A.3d at 66–67. Indeed, the buyer's complaint lacked any allegations that the venture equity fund directly represented anything to the buyer, instead pleading that it worked behind the scenes to coordinate the flow of information. *Id.* at 45.

[163] *Id.* at 59–61; *see also* Restatement (Second) of Torts § 533 (1977) (explaining a non-speaking party is accountable "if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction."); *id.* cmt. d ("If the misrepresentation is made for the purpose of having it communicated, the maker is subject to liability").

accountable for statements that they cause an artificial person, like a corporation, to make."[164]

Defendants argue that *ABRY Partners* only addressed contractual limitations on reliance and knowledge; neither it nor its progeny address the impact of clear non-recourse and survival clauses like those in the SPA.[165] While Plaintiffs do not flag it, a review of the docket in *ABRY Partners* reveals that, in fact, the agreement at issue there did contain a non-recourse provision that defendants pointed out on brief limited the liability of a subset of defendants named in the plaintiff's complaint.[166] The court in *ABRY Partners* appears not to have discussed that

---

[164] *Id.* at 59.

[165] DRB at 5–6, 16.

[166] *ABRY P'rs*, C.A. No. 1756-VCS, D.I. 15 (Tab 3, Part 4), § 11.10 ("Notwithstanding anything that may be expressed or implied in this Agreement, the Acquiror agrees and acknowledge that no recourse under this Agreement or any documents or instruments delivered in connection with this Agreement shall be had against any current or future director, officer, employee, general or limited partner of member of the Selling Stockholder or of any Affiliate or assignee thereof . . . . it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any current or future officer, agent or employee of the Selling Stockholder . . . for any obligation of the Selling Stockholder or of any Affiliate or assignee thereof . . . "); *id.* at 1 ("'Affiliate' means a Person that directly or indirectly, through one or more intermediaries, Controls, is controlled by, or is under common control with, the first mentioned Person), *id.* at 3 ("'Control' (including the terms 'controlled by' and 'under common control with') means the possession, directly or indirectly or as trustee or executor, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of stock or as trustee or executor, by contract or credit arrangement or otherwise."); *ABRY P'rs*, D.I. 26 (Defs.' Opening Br. in Supp. of Mot. to Dismiss Am. Compl.) at 22, 30 (Defendants arguing the No Recourse provision insulates them from liability for the seller's fraudulent misrepresentations); *ABRY P'rs*, D.I. 30 (Defs.' Reply Br. in Supp. of Mot. to Dismiss Am. Compl.) at 1 ("[A]ll claims against the Providence

provision directly in its decision, but its holding implicitly rejected the argument that

a non-recourse provision will operate to insulate a third-party from liability when

that party facilitated the target's lies.[167]  In a footnote, then-Vice Chancellor Strine

explained that he thought "it both more efficient and fair only to override a

contractual limitation on liability when that limitation would exonerate an actual liar

or someone complicit in a lie."[168]  This observation comports with other expressions

of Delaware law on the subject.[169]

---

Defendants [are] barred by the No Recourse Provision"), at 36 ("[T]he 'No Recourse' provision in Section 11.10 of the SPA [ ] extinguishes any liability and claims [against the Providence Defendants] . . . .").

[167] *See ABRY P'rs*, 891 A.2d at 1064 (denying motion to dismiss named third parties).

[168] *Id.* at 1063 n.82.

[169] *See, e.g.*, *Shenandoah Life Ins. Co. v. Valero Energy Corp.*, 1988 WL 63491, at *9 (Del. Ch. June 21, 1988) (analyzing indenture provision and holding that, "[w]hen the action is for breach of contract and *not* for fraud in the inducement of the investment, provisions of this kind [non-recourse] are effective to limit any liability that may be found to the issuer." (emphasis added)); *Surf's Up Legacy P'rs, LLC v. Virgin Fest, LLC*, 2021 WL 117036, at *11 (Del. Super. Ct. Jan. 13, 2021) (observing that the parties "could not have contracted" through a non-recourse provision to allow "the Managers[] [to] escape from fraud claims" because "Delaware courts refuse to enforce contracts purporting to condone—*or at least insulate*—intentional fraud."); *LaSalle Nat'l Bank v. Perelman*, 141 F. Supp. 2d 451, 461 (D. Del. 2001) ("[T]he Chancery Court generally held that no recourse provisions are limited to contract claims . . . ."); *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 793 (Del. Ch. 1992) ("[T]he no recourse provision does not bar equitable claims."); *Mabon, Nugent & Co. v. Tex. Am. Energy Corp.*, 1988 WL 5492, at *3 (Del. Ch. Jan. 27, 1988) ("Plaintiffs' remaining claims are not contractual and, therefore, the restrictions in the Indenture['s non-recourse clause] do not apply.").  While Defendants attempt to distinguish *Shenandoah* and *Mabon* because they addressed non-recourse provisions in the specific context of indentures and debentures, that distinction was recently and persuasively rejected by Judge Wallace.  *See Surf's Up*, 2021 WL 117036, at *11 n.143 (responding to seller's argument that caselaw involving debt instruments and indenture

As for the SPA's survival clause, *ABRY Partners* appears to have anticipated Defendants' argument that such clauses can shut down a contractual fraud claim when it quoted with approval comments to a Model Agreement and Plan of Merger Reorganization sponsored by the ABA' Mergers and Acquisitions Committee, advising that, "even in the context of a public company merger, irrespective of a contractual provision stating that representations and warranties do not survive closing, such a provision would not normally preclude post-closing fraud claims by one party against former officers and directors of the other party."[170] The court went on to observe that a general rule prohibiting sellers from invoking contractual limits, like survival clauses, "to exculpate a seller for lies about contractual representations of fact" eliminates "evidentiary uncertainty over whether the allegedly false

---

agreements was distinguishable by noting that Delaware courts are "indifferent to parties' labels for their transactions when a disclaimer of intentional fraud is concerned." (citing *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 136–37 (Del. Ch. 2009) (Laster, V.C.) ("Because of Delaware's strong public policy against intentional fraud, a knowingly false contractual representation can form the basis for a fraud claim, regardless of the degree to which the agreement purports to disclaim or eliminate tort remedies.")).

[170] *ABRY P'rs*, 891 A.2d at 1063 n.85; *see also* Will Pugh, *Getting What You Bargained for: Avoiding Legal Uncertainty in Survival Clauses for a Seller's Representations and Warranties in M&A Purchase Agreements*, 12 J. Bus., Entrepreneurship & L. 1, 29–30 (2019) (acknowledging that, while contractual limitations on liability, like survival clauses, serve laudable goals, those goals are less compelling in instances where a buyer is induced to contract by fraud within the contract); *see also* Shrayber & Hansen, *Anti-Reliance Clauses*, at 39–40 (analyzing *ABRY Partners* and including "narrow time limitations" as among the restrictions it allowed buyers to bypass in certain circumstances).

representations were made" and focuses the dispute on whether "they were materially false and whether the seller knew them to be false."[171]

The only other Delaware case that appears to have addressed the reach of a survival clause in the wake of *ABRY Partners* is *Sterling Network Exchange, LLC v. Digital Phoenix Van Buren, LLC*,[172] where the defendant asserted several counterclaims, including fraud, based on "various representations of fact" in a "Property Purchase Agreement" and an "SNS Agreement."[173] The plaintiff moved to dismiss those counterclaims in part because they were untimely under the shortened limitations periods in those agreements, which in one instance limited the survival of representations and warranties to six months after closing, and in the other limited the survival of representations and warranties to one year after closing and required the buyer to contest errors in the closing price within 60 days.[174] In opposing the motion, the defendant argued that, under *ABRY Partners*, contractually shortened limitations periods cannot be enforced where fraud is alleged.[175]

---

[171] *ABRY P'rs*, 891 A.2d at 1063 n.85.

[172] 2008 WL 2582920 (Del. Super. Ct. Mar. 28, 2008).

[173] DOB, Ex. F (*Sterling*, C.A. No. 07C-08-050, Defs.' Answer and Countercls.) ¶ 208.

[174] *Sterling*, 2008 WL 2582920, at *3, *5 n.30.

[175] *Id.* at *5.

While *Sterling* appeared to acknowledge that a survival clause fell within *ABRY Partners*' ambit of "contractual limitations on a party's ability to bring a fraud claim," it distinguished *ABRY Partners* on the ground that "the contract at issue in [*ABRY Partners*], in contrast to this one, failed to provide a **reasonable** period of opportunity to unearth possible misrepresentations."[176] With that distinction in mind, the court dismissed as untimely the defendant's counterclaims (including the fraud claim) to the extent they were based on contractual provisions that were subject to agreed-upon limitations periods.[177]

Though not entirely clear from the decision, I gather *Sterling* derived its "reasonableness" standard from the general statement of Delaware law that "parties may contractually agree to a period of limitations shorter than that provided for by statute, so long as this shortened period is reasonable."[178] Thus, while *Sterling*

---

[176] *Id.* (emphasis added).

[177] *Id.* at *5–6.

[178] *ENI Hldgs., LLC v. KBR Gp. Hldgs., LLC*, 2013 WL 6186326, at *7 (Del. Ch. Nov. 27, 2013) (citing *GRT*, 2011 WL 2682898, at *6; *Smith v. Mattia*, 2010 WL 412030 (Del. Ch. Feb. 1, 2010) ("It is well-established in Delaware that, in the absence of [an] express statutory provision to the contrary, a statute of limitations does not proscribe the imposition of a shorter limitations period by contract." (internal quotation marks omitted)); *see also Shaw v. Aetna Life Ins. Co.*, 395 A.2d 384, 386–87 (Del. Super. Ct. Nov. 6, 1978) (explaining that parties can shorten, but not lengthen, the statute of limitations period because statutes of limitations "proceed on the principle[] that it is to the interest of the public to discourage the litigation of old or stale demands; and are designed . . . to afford a security against the prosecution of the claims where, from lapse of time, the evidence becomes stale." (internal quotations and citations omitted)).

appears to acknowledge that *ABRY Partners*' rationale applies to survival clauses, it apparently did not view *ABRY Partners* as foreclosing the application of survival clauses to fraud claims as a matter of law on public policy grounds. This stands in contrast to this court's observation in *GRT, Inc. v. Marathon GTF Technology, Ltd.* that, *"[u]nless fraud is present*, a court will generally enforce the clear expression of the parties['] intent with respect to whether or not the representations and warranties will survive the closing."[179] Not likely a coincidence, *GRT* was decided by the same judge who decided *ABRY Partners*—then-Chancellor Strine.

Moreover, while *Sterling* distinguished *ABRY Partners* on the ground that the contract in *ABRY Partners* "failed to provide a reasonable period of opportunity to unearth possible misrepresentations,"[180] the court in *ABRY Partners* did not discuss the survival period for representations and warranties beyond its reference in *dicta* to the ABA M&A Committee commentary. Indeed, a review of the contract at issue in *ABRY Partners* reveals the limitations period for representations and warranties was "the twenty-one (21) month anniversary of the Closing Date"—which was *longer* than the six-month period prescribed by *Sterling*'s survival clause.[181]

---

[179] *GRT*, 2011 WL 2682898, at *13 n.68 (quoting Lou R. Kling & Eileen T. Nugent, 2 Negotiated Acquisitions of Companies, Subsidiaries and Divisions (2011) § 15.02[2] n.31) (emphasis added) ("Kling & Nugent").

[180] 2008 WL 2582920, at *5.

[181] *ABRY P'rs*, C.A. No. 1756-VCS, D.I. 15 (Tab 3, part 4) § 9.8.

Nevertheless, the court expressed its view that a survival clause would not defeat an otherwise well-pled contractual fraud claim.[182] The upshot is that the basis for *Sterling*'s rationale is questionable, and a reflexive application of a "reasonableness" standard to survival clauses in the context of contractual fraud is likely not warranted.

*****

It seems inevitable that, as a trial judge on a commercial court in Delaware, the time will come to confront *ABRY Partners* and offer a take on its meaning and scope. Having now offered my two cents on those subjects, I move on to apply its holdings to the contractual fraud claims at issue here.

### b. The SPA's Survival Clause Does Not Bar the Fraud Claim

Defendants' premiere contractual argument is that Section 10.1 of the SPA shortens the limitations period for claims based on allegedly false representations and warranties, and unambiguously provides that such claims expire upon Closing (November 1, 2018). Specifically, the SPA's survival clause provides in relevant part:

> the Parties, intending to modify any applicable statute of limitations, agree that (a) the representations and warranties in this Agreement and in any Ancillary Document shall terminate effective as of the Closing and shall not survive the Closing for any purpose, and thereafter there

---

[182] *ABRY P'rs*, 891 A.2d at 1064 n.85.

shall be no liability on the part of, nor shall any claim be made by, any Party or any of their respective Affiliates in respect thereof . . . .[183]

Defendants argue that a survival clause does not purport to limit a buyer's claim to a remedy (as in *ABRY Partners*), but rather limits the time in which that remedy may be pursued. As support, and not surprisingly, Defendants cite *Sterling* where, as noted, the court held that parties may agree contractually to shorten the limitations period for fraud claims without violating Delaware public policy, provided there is a reasonable opportunity to discover the potential misrepresentations.[184]

Plaintiffs respond that the SPA's survival clause is invalid under *ABRY Partners* as a *de facto* limitation of liability for contractual fraud. While Plaintiffs

---

[183] SPA § 10.1. I note that Plaintiffs did not argue that the SPA's Survival Clause did not expressly cover fraud claims, so I do not address that issue here. *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived."). Nor is there any dispute that Section 10.1 is a valid survival clause that effectively shortens the statute of limitations on covered claims, including breach of warranty claims.

[184] 2008 WL 2582920, at *5. Defendants also cite *Roma Landmark Theaters, LLC v. Cohen Exhibition Co.* for the proposition that Delaware courts do not ignore a contract's limitation of fraud claims, but the relevant analysis in *Roma* concluded that the buyer's claim for extra-contractual fraud failed because the buyer disclaimed reliance on the representation at issue through an *anti-reliance* clause, not a survival clause. 2020 WL 5816759, at *16 (Del. Ch. Sept. 30, 2020). Here, unlike *Roma*, Bertelsmann expressly stated that it *was* relying on the fraudulent misrepresentations. SPA § 5.7; *see also ABRY P'rs*, 891 A.2d at 1063 n.85 (citing authority for the proposition that, "irrespective of a contractual provision stating that the representations and warranties do not survive the closing, such a provision would not normally preclude post-closing fraud claims by one party against former officers and directors of the other party"); *Surf's Up*, 2021 WL 117036, at *11 (stating that the parties "could not have contracted" out liability for fraud that would allow "the Managers[] [to] escape from fraud claims" because "Delaware courts refuse to enforce contracts purporting to condone—or at least insulate—intentional fraud.").

do not argue *Sterling* was wrongly decided, they argue it is distinguishable here because they well plead they were not provided a reasonable period to unearth possible misrepresentations given the relevant information was not in the data room and the fraud related to the accounts receivable and sales and use tax liability did not surface until well after closing.[185]

For reasons already explained, I am reticent to endorse the rationale adopted in *Sterling*. Even assuming (without deciding) that *Sterling* provides the correct standard to apply to a survival clause in the context of a contractual fraud claim, an inquiry into reasonableness is inherently fact-intensive and generally "not appropriate for resolution on the pleadings."[186] One would expect this to be

---

[185] Compl. ¶ 52 ("No information concerning Thompson tax . . . was included among the Data Room materials or otherwise disclosed to Bertelsmann prior to closing."), ¶ 57 ("With respect to Bertelsmann, upon information and belief, the only other remaining serious bidder for OCL Holdings, the CIP Working Group chose not to disclose the critical information related to OCL's sales and use tax liability that it had learned, whether through the Data Room or otherwise. To the contrary, the CIP Working Group . . . made clear and unambiguous representations and warranties disclaiming the existence of any outstanding liability for sales and use taxes, which the CIP Working Group knew were false"), ¶ 66 ("OCL therefore maintained on its accounts receivable ledger multiple customer accounts receivable that Defendants knew were in fact bad debt but that should have been written off . . . ."), ¶¶ 80–86 (explaining that "after the Closing, Bertelsmann had discovered various accounting irregularities in OCL's books and records and errors in the Schedules to the SPA," including the critical false statements with respect to Defendants' tax liability), ¶ 96 ("Once Bertelsmann learned that the Defendants had committed fraud by concealing from, and misrepresenting to Bertelsmann OCL's significant sales and use tax liabilities in the SPA, it determined that such claims could not be brought before the Accounting Firm and filed its original complaint in the Superior Court on July 2, 2019.").

[186] *In re Cadira Gp. Hldgs., LLC Litig.*, 2021 WL 2912479, at *10 (Del. Ch. July 12, 2021); *see also Edinburgh Hldgs., Inc. v. Educ. Affiliates, Inc.*, 2018 WL 2727542, at *14 (Del. Ch. June 6, 2018) (declining to resolve on the pleadings "[t]he question of whether

particularly true where the court is asked to assess the "reasonableness" of a plaintiff's inability to uncover a fraud designed to induce their consummation of an agreement—a tort which, by definition, includes an element of deception.

Defendants nevertheless urge the Court to find Bertelsmann's 73-day diligence a "reasonable" period under *Sterling* to discover fraud for two primary reasons. *First*, in Section 5.7, Bertelsmann represented that it had full access to all information.[187] That same provision, however, states that the allegedly fraudulent representations within the agreement are accurate and complete, and that Bertelsmann relied on those representations.[188] Moreover, Plaintiffs affirmatively plead that the CIP Working Group actively chose to withhold tax information from Bertelsmann's data room, and then purposefully inserted false representations into the SPA regarding these same tax liabilities in order to throw Bertelsmann off the scent.[189] Plaintiffs were entitled to perform diligence under the assumption that

ASPE's post-closing management conducted the ASPE Business Unit 'in a reasonable manner consistent with its past practices'" (citing *Victaulic Co. v. Tieman*, 499 F.3d 227, 227 (3d Cir. 2007) ("Because reasonableness is a fact-intensive inquiry, we hold that it should not have been determined on the pleadings.")); *Chapter 7 Tr. Constantino Flores v. Strauss Water Ltd.*, 2016 WL 5243950, at *1 (Del. Ch. Sept. 22, 2016) (holding that "fact intensive" inquiries are "not appropriate for disposition on a motion to dismiss").

[187] SPA § 5.7.

[188] *Id.*

[189] Compl. ¶¶ 37, 57–58. I note that Plaintiffs allege Defendants actively discussed the Avalara Issue with another potential bidder, and it is inferable from the pleadings that the

representations of fact would, at the very least, not be intentionally falsified. For that reason, Section 5.7 does not render "reasonable" the 73-day period during which Bertelsmann conducted diligence.

*Second*, Defendants point to Section 11.3, where Bertelsmann represented that "[u]pon such determination that any provision of this Agreement (or portion thereof) is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties[.]"[190] Defendants argue in a footnote that this savings clause renders Plaintiffs' contractual fraud claims invalid as a matter of law because, under *Sterling*, a six-month post-closing discovery period was ample opportunity to discover the fraud as a matter of public policy, but Plaintiffs waited eight months after closing to bring their claims.[191]

As an initial matter, I reiterate my skepticism that *Sterling* is an accurate expression of Delaware law. Even if the holding there is sound, however, the "reasonableness" of delay would, by definition, be nuanced and ultimately require a fact intensive inquiry.[192] In this case, "reasonableness" would require an assessment

---

Sellers maintained separate, selectively populated data rooms for each potential bidder. Compl. ¶¶ 37, 52–57.

[190] SPA § 11.3.

[191] DOB at 36 n.7.

[192] Black's Law Dictionary, *Reasonable* (11th ed. 2019) ("Fair, proper, or moderate *under the circumstances*" (emphasis added)).

of the complexity of the alleged fraud and the efforts made to secret it.[193] The court in *Sterling* was not confronted with similar facts (e.g., fraud relating to a tax issue), so its conclusion with respect to timing cannot be reflexively applied here to determine on the pleadings that Plaintiffs' delay was unreasonable as a matter of law (or contract).[194]

Based on the weight of authority, and Delaware's public policy, I am satisfied that the SPA's survival clause cannot, and does not, defeat Plaintiffs' contractual fraud claims. To be clear, the clause serves its purpose—there can be no post-closing claim for breach of a warranty that did not survive closing. But the Sellers cannot invoke a clause in a contract allegedly procured by fraud to eviscerate a claim

---

[193] As noted, Plaintiffs well plead that they had no knowledge of the misrepresentations prior to Closing, alleging that Defendants intentionally withheld such information to induce Plaintiffs into purchasing CIP OCL at an inflated price. Compl. ¶¶ 37, 42–61, 104–17. While Defendants highlight the fact that another bidder was able to identify the Avalara Issue during the course of its diligence, again, it appears from the pleadings that Bertelsmann was provided a separate data room comprised of different information. *See* Compl. ¶ 37 ("Lipton and Formica directed the CIP Working Group as to what data to include or not include in the separate due diligence data rooms for potential bidders of OCL Holdings, including data relating to OCL's tax obligations and liabilities."). Though Plaintiffs discovered accounting errors soon after closing, the Complaint alleges the Buyers did not uncover the fraud relating to those errors until well after closing. Compl. ¶¶ 88, 96. Giving all reasonable inferences to Plaintiffs, I cannot say as a matter of law that Plaintiffs' delay was unreasonable.

[194] Though Defendants did not brief it, I also cannot say as a matter of law that Section 11.3 obligated Plaintiffs to plead that they made an effort to "negotiate in good faith" to modify the SPA, as if the SPA's savings clause operated as a condition precedent to a lawsuit. Section 11.3 leaves ambiguous whether the "determination" triggering a party's obligation to begin negotiations to modify invalid contractual provisions must be made by a court or a party to the SPA. *See* SPA § 11.3.

that the contract itself is an instrument of fraud. That is not, and cannot be, countenanced by Delaware law.

### c. The SPA's Nonrecourse Provision Does Not Bar Plaintiffs' Contractual Fraud Claim

Even if the Court does not credit their argument on the SPA's survival clause, Defendants contend that CIP Capital (and any other Defendant other than CIP OCL, for that matter) cannot be held liable for CIP OCL's contractual representations under the SPA's non-recourse and anti-reliance clauses.[195] Plaintiffs respond that it expressly relied on the allegedly fraudulent misrepresentations made by CIP OCL, and *ABRY Partners* does not permit CIP Capital to take cover behind a non-recourse provision if it knowingly participated in the alleged contractual fraud.[196]

As noted, in *ABRY Partners*, the court denied the defendants' motion to dismiss notwithstanding the presence of a non-recourse provision because the selling stockholder was effectively a special investment vehicle controlled by a private equity firm, and the contractual reps and warranties made by the seller necessarily flowed back to the private equity firm.[197] Commentators and courts have generally

---

[195] SPA § 11.16.

[196] *Id.* § 5.7 (providing Buyer did not rely "upon any representation or warranty by, or information from," Defendants, "except for the representations and warranties specifically and expressly set forth in Article III and Article IV.").

[197] *See ABRY P'rs*, 891 A.2d at 1037, 1040–41 ("That meant that the Seller had an intense interest in its value and in keeping with that, the Seller had assigned key personnel . . . to monitor the performance of the Company and interact with the Company's management

understood Delaware law to disregard non-recourse clauses where the parties purportedly insulated by those clauses were complicit in contractual fraud.[198] Thus, while Section 11.16 of the SPA purports to limit liability for claims arising out of the SPA, "the scope of a claim for contractual fraud [sweeps] more broadly."[199]

---

during the sale. But that did not necessarily mean that the Seller knew the Company in the same intimate manner that the Company's managers did. The managers had no prior affiliation with the Seller, and like any other private equity firm, the Seller was as much a monitor of, as a partner with, the Company's management.").

[198] *See, e.g.*, *Shenandoah*, 1988 WL 63491, at *9 (analyzing indenture provision and holding that, "[w]hen the action is for breach of contract and *not* for fraud in the inducement of the investment, provisions of this kind [non-recourse] are effective to limit any liability that may be found to the issuer." (emphasis added)); *Surf's Up*, 2021 WL 117036, at *11 (stating that the parties "could not have contracted" out liability for fraud that would allow "the Managers[] [to] escape from fraud claims" because "Delaware courts refuse to enforce contracts purporting to condone—*or at least insulate*—intentional fraud."); *LaSalle Nat'l Bank*, 141 F. Supp. 2d at 461 ("[T]he Chancery Court generally held that no recourse provisions are limited to contract claims . . . ."); *Geyer*, 621 A.2d at 793 ("[T]he no recourse provision does not bar equitable claims."); *Mabon*, 1988 WL 5492, at *3 ("Plaintiffs' remaining claims are not contractual and, therefore, the restrictions in the Indenture['s no recourse clause] do not apply."); Kling & Nugent § 15.02[2] n.31 ("Unless fraud is present, a court will generally enforce the clear expression of the parties' intent"). Defendants' cited cases to the contrary are readily distinguishable. *See Simons v. Cogan*, 549 A.2d 300, 305 (Del. 1988) (enforcing "no recourse" provision in the context of a breach of contract claim, not a fraud claim); *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 553–54 (Del. Ch. 2001) (enforcing contractual disclaimers barring fraud claims based on extra-contractual representations); *Harland Clarke Hldgs. Corp. v. Milken*, 646 F. App'x 223, 225 (3d Cir. 2016) (addressing only whether a non-recourse clause covered certain parties).

[199] *Prairie Cap.*, 132 A.3d at 60; *see also Airborne Health*, 984 A.2d at 136–37 ("Because of Delaware's strong public policy against intentional fraud, a knowingly false contractual representation can form the basis for a fraud claim, regardless of the degree to which the agreement purports to disclaim or eliminate tort remedies.")

Defendants counter this caselaw by highlighting the court's statement in *ABRY Partners* that, "it [is] difficult to fathom how it would be immoral for the Seller and Buyer to allocate the risk of intentional lies by the Company's managers to the Buyer."[200] But that observation was made in the context of the court's contemplation of a seller who did not have knowledge of the misrepresentations at issue.[201] It did not abridge *ABRY Partners*' central holding, namely "that the public policy of this State will not permit the Seller to insulate itself from [liability or] the possibility that the sale would be rescinded if the Buyer can show . . . that the Seller knew that the Company's contractual representations and warranties were false."[202] Because Plaintiff has well pled that CIP Capital did, in fact, know of and facilitate the fraudulent misrepresentations in the SPA through its participation in the CIP Working Group, CIP Capital cannot invoke the non-recourse provision to avoid liability under *ABRY Partners* and its progeny.

## B. Counts II–IV

Plaintiffs bring claims of aiding and abetting (Count II) against the Individual Defendants, civil conspiracy (Count III) against all Defendants, and unjust

---

[200] DRB at 18 (quoting *ABRY P'rs*, 891 A.2d at 1054).

[201] *ABRY P'rs*, 891 A.2d at 1062–63.

[202] *Id.* at 1064.

enrichment (Count IV) against CIP OCL, CIP Capital, Sheahan and Wilson.[203] Defendants' only argument in support of its bid for dismissal of any of these Counts is that the SPA bars Plaintiffs' predicate claim for fraud.[204] Having now rejected that argument, for reasons explained, Defendants' motion to dismiss Counts II–IV must be denied.[205]

## C. Count V

Plaintiffs seek a declaratory judgment on the scope of the Accounting Firm's authority under Section 2.4 of the SPA.[206] In response, Defendants maintain the Court does not have subject matter jurisdiction over this claim because no actual controversy exists.[207] Under Chancery Rule 12(b)(1), the Court must dismiss a claim where it lacks subject matter jurisdiction.[208] And "[t]he burden is on the plaintiff to demonstrate that subject matter jurisdiction exists."[209]

---

[203] Compl. ¶¶ 118–32.

[204] DOB at 44.

[205] *Emerald P'rs*, 726 A.2d at 1224 ("Issues not briefed are deemed waived.").

[206] Compl. ¶ 144.

[207] *Energy P'rs, Ltd. v. Stone Energy Corp.*, 2006 WL 2947483, at *6 (Del. Ch. Oct. 11, 2006); 10 *Del. C.* § 6502 (setting out the statutory standard for declaratory judgment).

[208] *Shahin v. City of Dover*, 2018 WL 4635730, at *4 (Del. Ch. Sept. 26, 2018).

[209] *Id.* at *3. When adjudicating a challenge to its subject matter jurisdiction, "the Court need not accept the plaintiff's factual allegations as true and is free to consider facts not alleged in the complaint." *Id.*

According to Plaintiffs, the following aspects of Bertelsmann's post-closing claims fall within the scope of the declaratory judgment sought in Count V:

| Item | Adjustment |
|---|---|
| Cash reconciliation | $117,832 |
| Accounts receivable, net, estimate to actual difference | $1,396,525 |
| Inventory, estimate to actual difference | $199,894 |
| Inventory, account clean-up | $31,487 |
| Accounts payable, estimate to actual difference | $597,663 |
| Deferred revenue, estimate to actual difference | $479,188 |
| Deferred revenue, correction for improper accounting | $1,090,894 |
| Other accrued expenses, estimate to actual difference | $734,001 |
| Other accrued expenses, sales bonus correction | $1,606,883[210] |

Plaintiffs submit that:

- The "estimate to actual differences," the "account clean-up," the "deferred revenue correction" and the "sales bonus correction" components of the Closing Statement should be resolved by the Accounting Firm;[211] and
- The remaining components—the sales tax correction and the accounts receivable allowance correction—are beyond the scope of the Accounting Firm's authority because they are the basis of Plaintiffs' fraud claims and accountants cannot resolve fraud claims.[212]

---

[210] Compl. ¶ 79.

[211] PAB at 60; Compl. ¶ 144.

[212] Compl. ¶ 144; PAB at 56–57.

For their part, Defendants agree with the first point—that the SPA requires the parties to submit their disputes over the "estimate to actual differences," the "account cleanup," the "deferred revenue correction" and the "sales bonus correction" components of the Closing Statement to the Accounting Firm for resolution.[213] Defendants also agree that the Accounting Firm should not resolve the sales tax correction component of the Closing Statement, for the reason that tax liabilities are expressly excluded from the definition of "Working Capital" subject to review by the Accounting Firm.[214] And Defendants agree that the Accounting Firm does not have the authority to resolve claims of fraud.[215]

Where the parties disagree is whether disputes relating to accounts receivable should be submitted to the Accounting Firm and the sequencing by which the various claims should be resolved. Defendants maintain the SPA requires the Buyer and Seller to submit their dispute over the "Accounts Receivable Allowance Correction" to the Accounting Firm to determine whether the purchase price should be adjusted.[216] According to Defendants, that is a pure accounting issue that Plaintiffs

---

[213] DOB at 22–23; DRB at 32.

[214] DOB at 12 (citing SPA § 1.1 (defining "Current Liabilities" to "exclude any items constituting Indebtedness, Debt-Like Items, Transaction Expenses or Tax liabilities")).

[215] DRB at 29.

[216] *Id.*

58

do not contend the Accounting Firm lacks the authority or expertise to resolve. Plaintiffs disagree and argue that aspects of the accounts receivable issue are laced with contractual fraud.

Because both parties agree that claims for fraud fall outside the Accounting Firm's purview under Section 2.4, but disagree on the scope of those fraud claims, a ripe controversy exists over the scope of Plaintiffs' fraud claims. That dispute cannot be outsourced to the Accounting Firm until this Court finally adjudicates the scope of the contractual fraud (if any).[217] That is the proper sequencing. For that reason, Defendants' motion to dismiss Count V is denied.

---

[217] Compl. ¶¶ 96, 100–03; *Ray Beyond Corp. v. Trimaran Fund Mgmt., L.L.C.*, 2019 WL 366614, at *6–7 (Del. Ch. Jan. 29, 2019) (explaining an accountant's authority is limited "to discrete factual issues within an independent accountant's expertise" and it "lack[s] authority to consider legal issues—breaches of representations and warranties regarding the target's historical accounting practice—when calculating the price adjustment."); *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 930 (Del. 2017) ("[I]t is important to recognize the limited role of the adjudicator, here an auditor (called the Independent Auditor in the Purchase Agreement), that Chicago Bridge and Westinghouse selected."); *see also id.* at 930 n.75 ("[I]ssues related to potential misrepresentations made by a seller 'are not generally viewed as the kind of disputes that would be resolved by the person charged with 'truing up' the books."). Defendants invoke the doctrine of quasi-estoppel as support for dismissal of Count V based on the premise that Plaintiffs have changed positions on what to submit to the Accounting Firm. DOB at 47. But the doctrine of quasi-estoppel is subject to a "high" standard and will be controlling only "when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Simon-Mills II, LLC v. Kan Am USA XVI Ltd. P'ship*, 2017 WL 1191061, at *35 (Del. Ch. Mar. 30, 2017) (citation and internal quotation marks omitted). As pled, Plaintiffs' change of position is not "unconscionable," as Bertelsmann came gradually to realize that what at first it believed to be good faith errors were in fact the products of fraud. Compl. ¶¶ 94–95, 100–01; *see also Pivotal Payments Direct Corp. v. Planet Payment, Inc.*, 2020 WL 7028597, at *4 (Del. Super. Ct. Nov. 30, 2020) (holding quasi-estoppel did not

59

## III.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **DENIED** on all Counts.

**IT IS SO ORDERED.**

---

apply where defendant initially asserted that the issues underlying plaintiff's claims were "[m]inor [p]roblems that [defendant] was fixing," and later asserted those same issues were clear evidence of defendant's inability to provide services to plaintiff, thus putting plaintiff on notice of their claims).